CECIL R. OZIER *et al.*, Plaintiffs-Appellants and Counterdefendants Cross-Appellees, *v.* CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Defendant-Appellee and Counterplaintiff Cross-Appellant—(HAROLD W. SCOTT, Counterdefendant Cross-Appellee.)

(No. 11656; )

Fourth District—May 16, 1973.

*Rehearing denied June 21, 1973.*

Summers, Watson & Kimpel, of Champaign, (Philip C. Zimmerly, of counsel,) for appellants.

Hatch, Corazza, Baker and Jensen, of Champaign, (Harold A. Baker and Timothy O. Madigan, of counsel,) for appellee.

Mr. JUSTICE TRAPP delivered the opinion of the court:

Plaintiffs appeal from a judgment in favor of defendant upon a complaint claiming $600,000 to be due upon a contract to acquire certain oil, gas and gas storage rights owned or to be acquired by plaintiffs. It is admitted that plaintiffs performed certain contractual obligations to acquire leases and show merchantable title to such, but defendant alleges a right to terminate the contract by reason of inability to establish an adequate gas storage reservoir. The defendant cross-appeals from the order of the trial court dismissing for want of equity its counter-claim

for rescission of the contract by reason of alleged misrepresentation and mutual mistake.

The contract, dated May 2, 1966, with two amendments, dated November 17, 1967 and May 31, 1968, involve some 36 pages of legal cap with elaborate provisions conditioning each undertaking, and repeated cross-references to such conditions. Notwithstanding such length, the parties disagree as to the fundamental terms of the contract and whether the parties contemplated the requirement of approval by the Illinois Commerce Commission for purposes of gas storage and any condemnation incident to such use.

While the agreement provided for the exchange of shares of stock in defendant company for all of the shares of stock in the Fishhook Gas Corporation owned by plaintiffs, the actual subject matter was the sale and purchase of 27 leases upon identified parcels of land containing approximately 4400 acres, and known as the "Fishhook Gas Field". In Sections 3 and 4 of the agreement, plaintiffs agreed to obtain, at their own expense, appropriately executed documents entitled "Easement to Conduct Exploratory Operations, Options for Gas Storage Grant, Oil and Gas Lease" within 18 months, together with abstract showing merchantable title in the grantors and to furnish such for examination by defendant. Such instruments, called leases, differed in content from the standard or usual oil and gas lease then held by plaintiffs. It was further agreed that such easements and options were to cover oil, gas rights in 85 per cent of the acreage and gas storage rights in 90 per cent of such.

Section 5 provided for escrow of all stock in "Fishhook" together with the sum of $100,000 deposited by defendant. While the contract speaks in dollar sums, it is specified that defendant was to transfer its stock as valued in dollars.

Section 6 provided that within sixty days of compliance with Sections 3, 4 and 5 of the agreement, defendant should direct the escrow agent to pay the sum of $100,000 to plaintiffs, and that at the same time defendant should tender or pay the sum of $500,000. This Section also provided that upon tender of $500,000, defendant would have the right to withdraw all gas and hydrocarbons in the Fishhook Field without payment of compensation whether or not defendant exercises its rights under Section 7 of the contract. The latter Section of the contract gives defendant the right, following the plaintiffs' performance of Sections 3, 4 and 5 at its option either to pay an additional $400,000 or to reassign all oil, gas and gas storage rights acquired from plaintiffs.

Section 17 is, in part:

"It is understood that the acquisition by Central of the stock

of Fishhook, the liquidation of Fishhook and the acquisition of its assets and rights by Central and other transactions contemplated by this agreement are or may be subject to the approval of such regulatory authority or authorities as may have jurisdiction with respect thereto. Central agrees, at its expense, to endeavor to obtain all requisite approvals or authorizations of such transactions by such regulatory authorities as counsel may advise; * * * all orders of regulatory authorities obtained pursuant hereto shall be such as to enable Central legally to carry out the transactions herein contemplated, including the liquidation of Fishhook and the acquisition of its assets by Central and such orders shall not be subject to any condition or conditions compliance with which would be unduly burdensome or materially disadvantageous to Central; and in the event such orders or any of them are not obtained or, if obtained, are subject to any such condition or conditions, Central may terminate this agreement without liability to the stockholders; * * *"

A document dated May 31, 1968, designated Amendment No. 2 to the agreement, refers to Section 17 of the contract and states that responsive to the requirement that Central endeavor to obtain all requisite approvals of regulatory bodies as counsel may advise, Central has employed James A. Lewis Engineering, Inc., a Texas corporation, to supplement the existing geologic map and to obtain additional evidence to present to the Illinois Commerce Commission to enable it to grant a Certificate of Convenience and Necessity, an order authorizing condemnation if necessary and an approval of the storage area known as "said Field" in the agreement. The document provides for drilling designated wells to the St. Peter stratum. By such document Central paid the consideration of $2071.20 to plaintiffs' agent for renewal payments on the leases affected.

The evidence established the execution of the contract, the acquisition of the leases and performance of other undertakings of the contract in Sections 3, 4 and 5, which plaintiffs were required to perform, the fact that plaintiffs did not receive any part of the $600,000 provided in Section 6 of the contract, the fact that defendant did not exercise the option under Section 7 of the contract and the fact that in July of 1968 defendant advised plaintiffs that defendant would not complete the contract. On October 4, 1968, defendant wrote plaintiffs that:

"[S]ince it would be impossible in the circumstances for it to obtain the requisite approval of the Illinois Commerce Commission to enable the Company to legally carry out the transactions contemplated by the Exchange Agreement, as amended, the Com-

pany regards the said agreement as terminated and hereby formally terminates it, as well as the Escrow Agreement, in accordance with the respective terms of the said documents."

The agreement does not specify to what depth or in what strata the gas storage is contemplated. The trial court prepared a memorandum filed with the record which finds that the agreement contemplated the use of the St. Peter formation for storage of gas; that to obtain approval to condemn defendant would be required to present a verified petition to the Illinois Commerce Commission to obtain a Certificate of Convenience and Necessity; that the evidence predominates that a satisfactory storage area does not exist in the St. Peter formation and that it is doubtful that defendant could, in good faith, file a petition to obtain authority to condemn and that they should not be required to do a useless thing. (See *Nelson v. American Business Bureau,* 241 Ill.App. 432.) The court further found in essence that the contract was for the sale of interests in a gas storage area; that upon the payment of $600,000 under Section 6 it was expected that defendant would pump gas from the Silurian level into the St. Peter formation to test the capacity of the latter to store gas, and that if gas was properly contained in the St. Peter formation, defendant would then pay an additional $400,000 in exercise of its option. The court further found the substantial payment of $600,000 was essentially computed upon the gas situated in the Silurian strata which it was contemplated would be injected into the St. Peter formation as a test of its capacity before defendant made an election under Section 7. The court further found that defendant's notice of termination was timely under the terms of Section 17 of the agreement.

Plaintiffs' contention here is essentially that the agreement is divisible and that upon the tender of the leases by plaintiffs, defendant was required to pay the sum of $600,000 for the gas known to exist at the Silurian level.

Such, however, was not the initial cause of action pleaded by plaintiffs. In the only complaint appearing in the record, i.e., an amended complaint filed April 2, 1969, plaintiffs alleged in Section 6 that defendant had a duty to obtain authority for the conduct of gas storage, and it breached such duty in failing to proceed to obtain such authority. After extensive motion practice directed against defendant's counter-claim, plaintiffs, in March, 1971, moved to strike such allegation as surplusage. It does not appear in the record whether such motion was ruled upon.

Dr. Harold Scott, a professor of geology, was initially associated with plaintiffs and at the time of negotiations held or controlled fifty per cent of the stock in Fishhook. The testimony discloses that Dr. Scott, with the plaintiffs, actively organized the Fishhook area as a unit obtaining

leases for 8000 acres with a view to providing gas storage in the Silurian strata. The testimony of Dr. Scott shows that he made an initial call upon officers of defendant to inquire as to their interest in acquiring gas storage. The evidence shows that Scott terminated such negotiations when it was ascertained that defendant was only interested in approximately 4000 acres. Thereafter, Scott, in 1964, renewed discussions concerning the sale of interests in 4400 acres for gas storage. Scott's testimony shows that at such time, officials of defendant indicated that they wanted 30 feet of closure in the St. Peter strata. At the time of such discussions it appears that the available geological data showed that the St. Peter formation was a major structure, but that there were no contours projected to show either the capacity enclosed by the structure, or its extent.

As internal evidence of the nature of the negotiations, the record discloses that defendant annually requires 12 to 15 billion cubic feet of gas to supply its customers. The sum of $600,000 contemplates the use of some 3 billion cubic feet of gas from the area of 4400 acres. The fact that defendant would not negotiate to buy the available gas from 8000 acres at the Silurian level tends to support a conclusion that the purchase of gas was not the principal purpose of the defendant.

Defendant's evidence included the testimony of four witnesses qualified by academic training and experience in the geologic and engineering questions involved, and who had examined the data and formed opinions as to the suitability of the St. Peter formation for gas and storage. Carroway, who had an academic degree in petroleum engineering and was the manager of Lewis Engineering, Inc., which specialized in oil, gas and gas storage work, testified that his firm was engaged to prepare data for the Illinois Commerce Commission concerning gas storage in the Fishhook Field. He requested the deepening of a number of wells in the area to the St. Peter formation, and testified that such drilling disclosed that the St. Peter formation did not lend itself to confining the gas in a sufficient closure without escape or migration, and that it was not suitable for storage. Wilson, a geologist who heads the gas and oil department of the Kentucky Geological Survey, was requested to advise concerning the possibility that the St. Peter formation paralleled the Silurian structure. He examined the available data and expressed the opinion that there was not sufficient closure available to create a mechanically feasible gas storage area. Williams, a consulting geologist who has supplied consulting service in the Illinois basin for some twenty years, expressed the opinion that he could not find a thirty foot closure in the St. Peter formation in the Fishhook lease block. Buschbach is a geologist employed by the Illinois State Geological Survey. He holds academic degrees on the sub-

ject from the University of Illinois, and has been involved in the structural interpretation of many deep storage gas projects in Illinois. He testified that to obtain a thirty foot closure it would be necessary to go beyond the lease block area. Rector was an employee of the defendant during the period of negotiations. He has a degree in mechanical engineering and has specialized in petroleum engineering. He had reviewed the data available from the deepening of the wells and stated an opinion that there was no appreciable structural closure which would keep the gas injected into the St. Peter formation within the lease block.

Dr. Scott, who had acted with plaintiffs in seeking the contract with defendant, testified at the trial to an opinion that the closure in the St. Peter formation could be obtained by acquiring the necessary interests in some 560 acres located outside of the contract area.

Plaintiffs contend that the language of the contract was not ambiguous and that the court erred in admitting evidence to establish the construction of the contract. Defendant cites *Herlihy Mid-Continent Co. v. Sanitary Dist.*, 390 Ill. 160, 60 N.E.2d 882; *Martindell v. Lake Shore Nat. Bank*, 15 Ill.2d 272, 154 N.E.2d 683 and *Western Ill. Oil Co. v. Thompson*, 26 Ill.2d 287, 186 N.E.2d 285. In *Herlihy*, the plaintiffs sought damages for delay in construction when the contract clearly stated that plaintiff could not receive any damages for delays caused by the defendant. *Martindell* holds that extrinsic evidence may be used to show the meaning of words susceptible of more than one meaning. In *Western Illinois Oil Co.* the parties sought to explain certain language:

"Paragraph 5 of said Lease and Agreement shall be deleted and the following shall be inserted therein as a new Paragraph 5."

The court there stated that the meaning of the language was plain. We have already noted that the plaintiffs stated their original cause of action in terms of a contractual duty to proceed with the steps necessary to procure regulatory authority.

■■ The trial court relied upon authorities including *Schneider v. Neubert*, 308 Ill. 40, 139 N.E. 84; *Hanson v. P. A. Peterson Home Ass'n*, 35 Ill.App.2d 134, 182 N.E.2d 237, and Cleary, Handbook of Illinois Evidence (2d ed. 1963), § 16 and § 17, p. 269, to determine that the evidence of practical construction given to a writing by the parties is admissible to resolve uncertainties of meaning. Upon the evidence the court found that obtaining authority from the Illinois Commerce Commission for gas storage was within the meaning of the contract. We conclude that the court did not err.

Plaintiffs urge that defendant did not give notice in apt time. The trial court found that the plaintiffs had not requested defendant to file a petition before the Commission, and thus the steps initiating the time

period for notice by defendants did not occur. The record is clear that shortly after the test drilling was completed, defendants gave verbal notice in July and written notice in October of 1968.

It is unnecessary to consider the evidence or merits of the issues presented upon defendant's cross-appeal, inasmuch as such cross-appeal was conditioned upon a reversal of the judgment upon plaintiffs' complaint.

A motion by defendant to strike portions of the record of the abstract and plaintiffs' objections thereto was taken with the case. In view of the disposition of the issues, the motion is denied.

The judgments below are affirmed.

Affirmed.

SMITH, P. J., and SIMKINS, J., concur.